IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                              :
DOROTHY D. MYERS on behalf of :    HON. JEROME B. SIMANDLE
herself and all others        :
similarly situated,           :    Civil No. 05-4608 (JBS)
                              :
              Plaintiffs,     :
                              :         OPINION
       v.                     :
                              :
MEDQUIST, INC. et al.,        :
                              :
              Defendants.     :
                              :
```

APPEARANCES:

Laura A. Feldman, Esq.
FELDMAN & PINTO
1604 Locust Street, 2R
Philadelphia, PA 19103
     -and-
Lisa J. Rodriguez, Esq.
Nicole Achione, Esq.
TRUJILLO, RODRIGUEZ & RICHARDS, LLP
258 Kings Highway East
Haddonfield, NJ 08033
     -and-
Adam Pessin, Esq.
FINE, KAPLAN, & BLACK, R.P.C.
1835 Market Street, 28th Floor
Philadelphia, PA 19103
     -and-
Stevan A. Miller, Esq.
DREW, ECKL & FARNHAM, LLP
880 West Peachtree Street
Atlanta, GA 30309
     Attorneys for Plaintiffs

Marc J. Gross, Esq.
Olivier Salvagno, Esq.
GREENBAUM, ROWE, SMITH & DAVIS, LLP
75 Livingston Avenue
Suite 301
Roseland, NJ 07068-3701
     -and-
Neal Marder, Esq.

Gail Standish, Esq.
Stephen Smerek, Esq.
David Hickey, Esq.
WINSTON & STRAWN, LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
     Attorneys for Defendants

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

     Presently before the Court is Plaintiffs' unopposed motion

for class certification, final approval of the class action

settlement, and for reimbursement of attorneys' expenses [Docket

Item 291].  At the heart of this lawsuit are the allegations that

Plaintiffs – medical transcriptionists who worked for MedQuist

either as employees or independent contractors between November

29, 1998 and August 11, 2008 – were systematically underpaid as a

result of MedQuist's alleged undercounting of the lines its

transcriptionists transcribed.  After years of litigation, during

which Plaintiffs' counsel engaged in extensive discovery and

motion practice, Plaintiffs were unable to produce evidence that

MedQuist engaged in any of the undercounting practices they

alleged.  After these difficulties became apparent to Plaintiffs'

counsel, the parties engaged in months of arm's-length settlement

negotiations, the product of which was the proposed class

settlement presently under consideration.

     As the discussion herein makes clear, the Court finds, based

upon Plaintiffs' submissions and the evidence and argument

presented at a Final Settlement Hearing convened on March 27, 2009, that this settlement represents a good value to the class for what has proved to be a very weak case.  For the reasons explained below, the Court will grant Plaintiffs' motion for class certification; grant the motion for final settlement approval, finding that the settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e); and grant Plaintiffs' motion for the reimbursement of attorneys' actual expenses, there being no attorneys' fees sought.

## II.   BACKGROUND

### A.   Plaintiffs' Allegations

This case is a consolidation of three putative class actions.  Myers v. MedQuist was the action originally filed in this Court, which asserted jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A).  The two cases that were filed in other districts – Hoffman v. MedQuist, No. 04-3452 (N.D. Ga.) and Force v. MedQuist, No. 05-2608 (N.D. Ga.) – were transferred to this Court and have been consolidated with the Myers action.  On January 31, 2006, Plaintiffs filed a consolidated Amended Complaint ("CAC") [Docket Item 11] under the Myers Docket.

The individually named Plaintiffs are current MedQuist medical transcriptionists and individuals who worked as medical transcriptionists for MedQuist either as employees or independent

3

contractors from at least November 29, 1998 through July 30, 2004. (CAC ¶ 1.)  MedQuist is the largest provider of medical transcription services in the United States.  (Id. at ¶ 12.) MedQuist Transcriptions, Ltd. ("Transcriptions") is a wholly-owned subsidiary of MedQuist, Inc. ("MedQuist, Inc.") (Id. at ¶ 11.)

This Court summarized Plaintiffs' allegations in its December 20, 2006 Opinion denying Defendants' motion to dismiss as follows:

> Medical transcription entails the conversion of voice information dictated by health care professionals into an electronic format or written report.  (CAC at ¶ 18.) Dictation is forwarded electronically to a MedQuist transcriptionist who pulls up a computer template for the particular type of report or account and transcribes the medical report.  (CAC at ¶ 19.)  The report is then transmitted electronically to MedQuist's computer system for client billing and payroll.  (Id.)  Although the transcription technology employed by MedQuist has changed over the years, the basis for its payment of medical transcriptionists has not.  (Id. at ¶ 20.) Transcriptionists are paid according to the number of "lines" they transcribe, and MedQuist agreed that a line would consist of 65 "characters."  (Id. at ¶ 21.)  Under the agreements the transcriptionists had with MedQuist, "characters" were defined as all characters typed by a transcriptionists and appearing in a document, including blank spaces between words and the actual character count of words generated by macros and expanders. (Id. at ¶[¶] 24-26, 28-29, 31.)   For transcriptionists payroll purposes, the line count was to be determined by accurately counting the total number of characters and dividing by 65.  According to Plaintiffs, MedQuist repeatedly affirmed its agreement to pay transcriptionists based on the 65-character line count (with such statements being made by officers of MedQuist, on MedQuist's web site, and through representations made by MedQuist when it acquired a new business.)  (Id. at ¶ 29, 31.)

According to Plaintiffs, such representations and assurances were false. (Id. at ¶ 33.)  Despite agreeing to pay transcriptionists based on a 65-character defined line, MedQuist systematically undercounted its transcriptionists' output and manipulated the number of characters and/or lines used to calculate payments to transcriptionists. (Id.)  According to Plaintiffs, to effectuate their scheme, MedQuist manipulated the MedQuist computer systems used for billing and payroll purposes and falsified line counts to achieve a 2:1 or even 3:1 billing-to-payroll ratio. (Id. at ¶ 37.)

(Docket Item 30 at 4-6) (footnotes omitted).

## B.   Procedural History and Parties' Discovery

After the three actions were consolidated into the Myers Docket before this Court and after Plaintiffs filed the Consolidated Amended Complaint, Defendants filed a motion to dismiss [Docket Item 17], which this Court denied in its December 20, 2006 Opinion and Order [Docket Items 30 and 31].  After MedQuist filed its Answer to the Consolidated Amended Complaint [Docket Item 33], the parties engaged in extensive discovery over the course of approximately one year.[1]  The parties' discovery resulted in considerable motion practice before Magistrate Judge Donio [e.g., Docket Items 60, 65].  As Plaintiffs represent in

---

[1]  As Plaintiffs made clear at the March 27, 2009 hearing, in addition to the discovery produced by Defendants, Plaintiffs' counsel and their investigators interviewed hundreds of potential witnesses in their efforts to develop the evidence to support their claims.  Plaintiffs hired the investigative firm of LR Hodges, which tracked down between fifty and one hundred potential witnesses across the country, and Plaintiffs' attorneys themselves interviewed between one hundred and two hundred potential witnesses, in addition to the approximately two dozen depositions taken, as described herein.

the brief in support of their motion for settlement approval:

> In total, the parties conducted approximately two dozen depositions of relevant parties and witnesses. Plaintiffs deposed nearly all of the senior executives that worked at MedQuist during the Class Period. Plaintiffs deposed numerous computer and technical employees from MedQuist concerning the operation of MedQuist's computer systems and transcription platforms. Plaintiffs also deposed numerous MedQuist employees who hired and recruited transcriptionists during the Class Period.

(Pls.' Br. at 3.)  According to Plaintiffs, over the course of this discovery period, Defendants produced, and Plaintiffs reviewed, approximately one million pages of documents.  (Id.) During this time, Plaintiffs also retained two experts (one technical specialist and one industry medical transcription industry analyst).  (Id. at 3-4.)

### C.   Settlement Negotiations and Proposed Class Settlement

As Plaintiffs indicate in their submissions to the Court, and as became clear at the March 27, 2009 hearing, notwithstanding Plaintiffs' expansive discovery and investigative work, no evidence emerged to support their allegations that MedQuist had systematically underpaid its transcriptionists. Plaintiffs' computer expert reviewed thousands of pages of medical reports generated by class members, as well as other data MedQuist produced during discovery, and was unable to find any evidence of a pattern of underpayment through the undercounting of lines.  As Plaintiffs represented at the March 27, 2009 hearing, their technical expert, in reviewing the data, found no

6

evidence to suggest that MedQuist undercounted lines in transcription reports at a more frequent rate than it overcounted such lines.  Simply put, the expert found anecdotes of undercounting and overcounting, but, according to Plaintiffs' own expert, such traces could not reasonably be construed as anything beyond "random noise," i.e., no pattern of undercounting was detected.

In addition, over the course of their depositions, "a number of Plaintiffs' declarants retracted, contradicted or otherwise undermined the evidence upon which Plaintiffs intended to rely." (Pls.' Br. at 4.)  In particular, as the parties indicated at the March 27, 2009 hearing, two of the individually named Plaintiffs – Dorothy Myers and Wendy Svoboda – reexamined their reports which had formed the basis of Plaintiffs' allegations of undercounting and underpayment, and, during their depositions, testified that MedQuist had, in fact, accurately counted the lines in the reports.  In early 2008, the parties commenced settlement negotiations, and, on April 23, 2008, the Court entered an Order [Docket Item 115] staying the case to permit the parties' settlement negotiations to proceed.

On September 22, 2008, following months of negotiations between the parties, Plaintiffs filed a motion seeking preliminary approval of the proposed class settlement [Docket Item 117].  Under the terms of the proposed settlement,

Defendants would consent to the entry by the Court of an injunction requiring them to take various actions aimed at ensuring the transparency of the very compensation policies that gave rise to this dispute.  (Docket Item 133 Ex. A-1 at 3-4.) Specifically, MedQuist would agree to an injunction requiring it to take the following actions:

> (a) implement and disseminate a formal written policy that expressly discloses all definitions of payroll lines used by MedQuist transcription platforms for compensating medical transcriptionists; (b) make all definitions of payroll lines used by MedQuist transcription platforms available to MedQuist employees, candidates for employment, and the general public by including it within MedQuist's internet website; (c) make all definitions of payroll lines used by MedQuist transcription platforms available to MedQuist employees . . . by including it in MedQuist's employee handbook and other materials distributed to medical transcriptionists for their ongoing reference; (d) make available all definitions of payroll lines used by MedQuist transcription platforms to candidates for employment as a medical transcriptionist prior to or in connection with any verbal or written offer of employment; (e) identify for all medical transcriptionists who are to be paid based on a payroll line unit of measure, prior to or in connection with any verbal or written offer of employment, the payroll line definition that will be used to calculate their pay; and (f) provide written notice to the affected trancriptionist employees in the event that MedQuist alters the definition of a payroll line or otherwise causes transcription work to be calculated for payroll purposes according to a different payroll line definition.

(Id.)

Additionally, pursuant to the terms of the proposed settlement, MedQuist would agree to pay a total of $1.5 million to a settlement fund.  (Id. at 2.)  Under the proposed

8

settlement, the settlement administration costs (estimated to be $150,000) and Plaintiffs' attorneys' costs (of approximately $248,000) would be deducted from the settlement fund, the remainder of which (but not less than $1 million) would be given to the Association for Healthcare Documentation and Integrity ("AHDI") "to fund programs for the general benefit of medical transcriptionists and the medical transcription industry."[2] (Id. at 11.)  The proposed settlement further provides that "[q]ualifying class members will also be eligible to participate in certain AHDI programs free of charge.  The value of the free educational and professional courses provided by AHDI is up to $200 per class member."  (Id. at 11-12.)  Significantly, Plaintiffs' attorneys would be awarded no fees under the terms of the proposed settlement.  (Id. at 11.)

### D.   Preliminary Settlement Approval and Class Response

In its October 17, 2008 Letter Order, the Court sought supplemental briefing from the parties to address why "the

---

[2]  According to AHDI's website, the organization's purpose is "[t]o set and uphold standards for education and practice in the field of clinical documentation that ensure the highest level of accuracy, privacy, and security for the U.S. healthcare system in order to protect public health, increase patient safety, and improve quality of care for healthcare consumers."  AHDI, http://www.ahdionline.org/scriptcontent/aastrategicplan.cfm (last visited Mar. 30, 2009).  The organization "works tirelessly to give thousands of medical transcriptionists a voice before legislative and regulatory agencies and to ensure MTs are recognized for their contributions to patient safety and risk management."  AHDI, http://www.ahdionline.org/scriptcontent/about.cfm (last visited March 30, 2009).

parties elected the method of distribution of the settlement fund reflected in the proposed agreement, under which the fund is to be directed to . . . AHDI," and whether it was "in the interest of the absent class members for the settlement fund to be directed to AHDI rather than being distributed among the class members." (Docket Item 118 at 1.) In their joint letter in response to the Court's Order, the parties indicated that MedQuist made clear throughout the negotiations period that it was unwilling to agree to a settlement in which direct payments to the class members would be made, and that no settlement could be reached if the Plaintiffs insisted on such direct payments. (Docket Item 119 at 2.) With regard to the distribution of the settlement fund to AHDI, the parties explain that in selecting an organization to which a payment could be made in order to benefit the class, Plaintiffs and Defendants turned to their respective industry experts in order to "identify an organization dedicated to benefit[t]ing medical transcriptionists individually and collectively," and that AHDI was the only organization that met such requirements.[3] (Id.)

---

[3] In its March 17, 2009 Letter Order [Docket Item 296], the Court called upon the parties to produce a representative from AHDI to testify at the Final Settlement Hearing. Specifically, the Order indicated:

> This witness should have knowledge of the purposes and history of the organization, as well as the organization's relationship (if any) with MedQuist, and should be prepared to testify about how the settlement

On November 7, 2008, the Court convened a hearing to address Plaintiffs' unopposed motion for preliminary approval of the class settlement.  On December 23, 2008, the Court entered an Order Preliminarily Approving Settlement and Providing for Notice (the "Preliminary Approval Order") [Docket Item 133], which, inter alia, directed the Settlement Administrator to distribute a Notice of Pendency and Proposed Settlement of Class Action (the "Notice") to all "Settlement Class Members who can be identified with reasonable effort," to publish the Complaint on a website, to publish a Summary Notice of Settlement in two separate issues of USA Today.  (Docket Item 133 at 4.)  The Preliminary Approval Order scheduled the Final Settlement Hearing for March 26, 2009, a date which, with the consent of the parties, the Court subsequently adjourned by one day to March 27, 2009.  (Docket Item 295 at 1.)

The Notice was subsequently mailed to approximately 28,000 potential class members.  (Lake Decl. ¶ 6.)  Between the responses received by the Settlement Administrator, (id. at ¶ 8), and those sent to the Court, 202 potential class members opted to exclude themselves from the proposed settlement, and 153 potential class members wrote to object to the settlement; in

-----

fund would be applied to the benefit of the settlement class.

(Docket Item 296 at 1-2.)

all, these submissions amount to less than 1.7% of the class members.  The vast majority of these objections target the distribution of the settlement fund to AHDI, with the objectors asserting primarily that the settlement fund should be divided and distributed among the class members directly.  Additionally, approximately nineteen objectors state that the funds should not be distributed to AHDI,[4] stating either (1) that AHDI does not represent the interests of American transcriptionists because it advocates on behalf of those who wish to outsource transcription work overseas,[5] or (2) that AHDI benefits the transcription industry, not transcriptionists, and is too closely tied to MedQuist.[6]

**E.   Final Settlement Hearing**

On March 27, 2009, the Court convened a Final Settlement Hearing to review Plaintiffs' motion for certification, settlement approval, and reimbursement of costs.  No class member appeared at the hearing to express an opinion about the settlement's terms.

At the hearing, the Court heard the testimony of Dr. Peter

---

[4]   [Docket Items 137, 139, 142, 155, 156, 161, 170, 184, 188, 189, 190, 194, 197, 239, 247, 289, and 290].

[5]   [Docket Items 137, 139, 155, 156, 161, 170, 184, 188, 189, 190, 194, 197, 208, 239, 247, 272, 289, and 290].

[6]   [Docket Items 142, 208, and 272].

Preziosi, the Executive Director of AHDI.[7]  Dr. Preziosi testified that AHDI advocates on behalf of medical transcriptionists in a variety of contexts, including before Congress and to different health organizations.  As to the concerns raised by some objectors concerning whether AHDI's aim is to assist transcriptionists or the transcription industry, according to Dr. Preziosi, the organization has approximately 7,000 members, the vast majority of whom are individual transcriptionists.  Although AHDI counts among its members a small number of corporations, including MedQuist, only a small percentage of AHDI's membership dues are attributable to corporate members, with the great bulk of membership dues coming from individual members.[8]  With regard to the sources of the organization's funding, Dr. Preziosi testified that approximately 45% comes from membership dues; 25% comes from sales of its

---

[7]  See Note 3, supra.

[8]  Dr. Preziosi's testimony concerning the limited role of corporate members in AHDI is consistent with the organization's bylaws, which expressly limit the role that corporate members may play in the organization:

> Any healthcare delivery facility, company or manufacturer, which employs medical transcriptionists or provides services or products to the field. Corporate members shall not be entitled to vote or to hold office. A representative from a corporate member company may serve on committees, but does not have the right to vote.

AHDI, http://www.ahdionline.org/scriptcontent/Downloads/ AHDIBylaws.pdf at 3 (last visited Mar. 30, 2009).

products, services, and programs to transcriptionists; 15% comes from revenues from the organization's annual convention; and the remainder comes from advertising sales from the organization's journal, newsletter, and website.  Dr. Preziosi also indicated that AHDI has a position statement related to the best practices for transcriptionist compensation, and offers transcriptionists professional courses on how to negotiate favorable terms of compensation.  As to the belief of the eighteen objectors that AHDI advocates on behalf of those who wish to see transcription work outsourced to other countries, Dr. Preziosi testified that although AHDI's online courses are offered worldwide, the organization does not advocate in favor of foreign outsourcing.

With regard to the courses that AHDI agreed, through the settlement, to make available to class members, Dr. Preziosi stated that 10,000 places in a variety of courses were set aside for class members.  At the hearing, the Court noted that the deadline of December 31, 2009 contained in the proposed settlement for class members to sign up for AHDI's courses afforded class members a somewhat narrow window in which to take advantage of the settlement, and the parties, along with Dr. Preziosi on behalf of AHDI, agreed to extend the registration deadline until July 1, 2010.  Thus, as revised, a Class Member will have until July 1, 2010 to enroll in one of the AHDI offerings, which may be completed after that date.

14

Finally, with regard to the Court's questions concerning the financial stability of AHDI, Dr. Preziosi indicated that AHDI is solvent and would not risk losing the settlement fund to a judgment creditor.  According to Dr. Preziosi, although the organization encountered financial difficulties before he became Executive Director in 2003, it has been profitable since 2005 and is subject to no judgments or claims of debtors.

Upon reviewing the terms of the proposed settlement, the arguments of counsel at the hearing, and the testimony of Dr. Preziosi, the Court informed counsel at the March 27, 2009 hearing that it would grant Plaintiffs' unopposed motion for class certification, settlement approval, and cost reimbursement, and that its reasoning would be spelled out in a forthcoming written opinion.  The Court sets forth this reasoning below.

## III. DISCUSSION

### A.   Class Certification

The Court of Appeals reviewed the Supreme Court's prescriptions regarding the certification of settlement classes in In re Community Bank of Northern Virginia:

> [T]he Amchem Court held that certification of classes for settlement purposes only was consistent with Fed. R. Civ. P. 23, provided that the district court engages in a Rule 23(a) and (b) inquiry:
>
> > Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the

15

> proposal is that there be no trial.  But other
> specifications of the Rule – those designed to
> protect absentees by blocking unwarranted or
> overbroad    class    definitions    –    demand
> undiluted, even heightened, attention in the
> settlement context.   Such attention is of
> vital importance, for a court asked to certify
> a settlement class will lack the opportunity,
> present when a case is litigated, to adjust
> the class, informed by the proceedings as they
> unfold.
>
> [Amchem Products, Inc. v. Windsor, 521 U.S. 591, 621
> (1997)] . . . .
>
> Thus, regardless of whether a district court certifies a
> class for trial or for settlement, it must first find
> that the class satisfies all the requirements of Rule 23
> . . . . In making this analysis, the district court may
> take  the  terms  of  the  proposed  settlement  into
> consideration.   The central inquiry, however, is the
> adequacy of representation.   Thus, subdivisions (a) and
> (b) of Rule 23 focus court attention on whether a
> proposed class has sufficient unity so that absent
> members can fairly be bound by decisions of class
> representatives.    That dominant concern persists when
> settlement, rather than trial, is proposed.

In re Community Bank of Northern Virginia, 418 F.3d 277, 299-300

(3d Cir. 2005) (some internal quotations and citations omitted).

In short, the Court must satisfy itself that the Rule 23(a) and

23(b)(3) criteria are met before determining whether the

settlement is "fair, reasonable, and adequate," Fed. R. Civ. P.

23(e)(2), with the principal focus on "whether a proposed class

has sufficient unity so that absent members can fairly be bound

by decisions of class representatives."   In re Community Bank of

Northern Virginia, 418 F.3d at 300 (citation omitted).  With

these principles in mind, the Court turns to the question of

whether the class at issue herein should be certified.

"District courts have discretion under Rule 23 to certify a class." Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006). To certify a class, the Court must find that the proposed class meets the prerequisites to a class action; "plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." In re Chiang, 385 F.3d 256, 264 (3d Cir. 2004). As the Court now explains, the Court finds that Plaintiffs have established that the criteria of Rules 23(a) and 23(b)(3) are satisfied here, and will grant their motion for class certification.

### 1.    Rule 23(a)

The considerations under Rule 23(a) are amply satisfied in this class action. Rule 23(a), Fed. R. Civ. P., provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Where, as here, "an action is to proceed under Rule 23(b)(3), the commonality requirement [of Rule 23(a)] is subsumed by [Rule 23(b)(3)'s] predominance requirement." Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 148 (3d Cir. 2008) (internal quotations and citations omitted). The

17

Court's Rule 23(a) discussion herein accordingly accounts for the numerosity, typicality, and adequacy factors, leaving the consideration of commonality for the discussion of Rule 23(b)(3) predominance, _infra_.  See _id._

The class at issue herein is more than sufficiently numerous for certification under Rule 23(a).  As the Court of Appeals has explained, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001).  The class in this case includes over 28,000 members, (Lake Decl. ¶ 6), easily meeting the requirements for Rule 23(a)'s numerosity prong.

The typicality prong is likewise satisfied here.  To address the question of typicality, the Court assesses

> whether the named plaintiffs' claims are typical, in
> common-sense terms, of the class, thus suggesting that
> the incentives of the plaintiffs are aligned with those
> of the class.  Factual differences will not render a
> claim atypical if the claim arises from the same event or
> practice or course of conduct that gives rise to the
> claims of the class members, and if it is based on the
> same legal theory.

<u>Beck</u>, 457 F.3d at 295-96 (internal quotations and citations omitted).  Put differently, "[t]ypicality entails an inquiry whether the named [plaintiffs'] individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class

members will perforce be based." <u>Hassine v. Jeffes</u>, 846 F.2d 169, 177 (3d Cir. 1988) (internal quotations and citations omitted).

The named Plaintiffs' claims in this case undoubtedly "arise[] from the same . . . practice or course of conduct that gives rise to the claims of the class members," and are based on the same legal theory. <u>Beck</u>, 457 F.3d at 295-96 (internal quotations and citations omitted). Each of the named Plaintiffs has alleged that he or she, like the absent class members, had an agreement with MedQuist under which the transcriptionist-Plaintiff would be compensated on a sixty-five-character line count basis, and that MedQuist modified its transcription programs to undercount the characters in a given line, resulting in underpayment. Plaintiffs have thus "alleged that they suffered harm as the result of the same company-wide conduct that injured the absentee class members," meaning that the typicality criterion is unquestionably satisfied here. <u>In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions</u>, 148 F.3d 283, 312 (3d Cir. 1998).

The final Rule 23(a) consideration is whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). With regard to Rule 23(a)'s adequacy prong, the Court of Appeals has explained that the Court's task is to address whether "the

putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." Hassine, 846 F.2d at 179. "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975).

The Court finds that both of these factors are present here. Plaintiffs' attorneys have substantial experience with class actions, and have litigated this matter zealously, as review of the motion practice, discovery, and negotiations in this matter, supra, makes clear. Moreover, "[s]ince all members of the class would need to demonstrate the existence of [a policy of undercounting characters by MedQuist], their interests are sufficiently aligned that the class representatives can be expected to adequately pursue the interests of the absentee class members." In re Prudential, 148 F.3d at 312. Nothing in the record suggests even remotely that any named Plaintiff has interests which diverge from those of the absent class members in any way. The Court concludes that the representative parties fairly and adequately represent the interests of the absent class

20

members.  In summary, the class in this case easily meets Rule
23(a)'s criteria for class certification.

        2.   <u>Rule 23(b)(3)</u>

    In addition to the requirements of Rule 23(a), a party
seeking class certification must demonstrate that certification
is appropriate under one of the subsections of Rule 23(b).
<u>Chiang</u>, 385 F.3d at 264.  Plaintiffs argue that certification in
this case is appropriate under Rule 23(b)(3), which provides that
a class action may be maintained if:

> the court finds that the questions of law or fact common
> to class members predominate over any questions affecting
> only individual members, and that a class action is
> superior to other available methods for fairly and
> efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).

    The Court finds that Rule 23(b)(3)'s predominance and
superiority requirements are satisfied here.  The predominance
requirement "tests whether the class is sufficiently cohesive to
warrant adjudication by representation," requiring that "issues
common to the class . . . predominate over individual issues."
<u>Danvers</u>, 543 F.3d at 148 (internal quotations and citations
omitted).  The predominance inquiry shares with Rule 23(a)'s
commonality criterion a consideration of whether the class
members' claims are factually and legally similar, <u>see Johnston
v. HBO Film Mgmt.</u>, 265 F.3d 178, 184 (3d Cir. 2001), but the Rule
23(b)(3) standard is "far more demanding," <u>In re Hydrogen</u>

Peroxide Antitrust Litigation, 552 F.3d 305, 310 (3d Cir. 2008)
(quoting Amchem, 521 U.S. at 623-24), requiring that common class
issues predominate over individual issues.  See In re LifeUSA
Holding Inc., 242 F.3d 136, 145-46 (3d Cir. 2001).

     The Court finds that the claims of the members of the
proposed class share essential common questions of law and fact
that predominate over the individual issues in this matter.  In
particular, Plaintiffs have alleged that each of the class
members had an agreement with MedQuist under which he or she
would be paid by the line, and, according to the testimony of
Plaintiffs' industry expert, within the medical transcription
industry, the definition of a line as consisting of sixty-five
characters was universally understood within the industry.  The
existence of a uniform compensation policy, with the commonly
understood industry term of a sixty-five-character defined line,
is an essential factual element shared by all class members'
breach-of-contract claims, and is demonstrative of the class
cohesion at which Rule 23(b)(3)'s predominance inquiry is
targeted.  In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d
at 310-11.

     The extent to which common issues predominate over
individual questions in this case is likewise demonstrated by
Plaintiffs' assertions as to how MedQuist allegedly breached its
agreements with the class members.  In particular, Plaintiffs'

case turns on their capacity to prove that MedQuist configured its transcription platforms in a manner that omitted certain types of characters from all of its transcriptionists' payroll counts.  This is, in other words, a case of allegedly systematic underpayment through a single corporate practice, indicating that the "nature of the evidence that will suffice to resolve . . . [the] question" of MedQuist's liability for breach of contract would focus on a corporate practice common to all claims.  Id. As the Court of Appeals held in In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions, "[p]redominance is a test readily met" in cases "involving a common scheme . . ."  148 F.3d at 314 (citation omitted).  The Court finds that common questions in this case concerning the existence of a systematic corporate practice of undercounting payroll lines and underpaying transcriptionists, as well as the existence of an industry-wide definition of a sixty-five-character defined line, predominate over questions unique to the individual class members, and, accordingly, that this "class is sufficiently cohesive to warrant adjudication by representation."  Danvers, 543 F.3d at 148 (internal quotations and citations omitted).

Finally, the Court concludes that Rule 23(b)(3)'s superiority criterion is satisfied here.  "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of

alternative available methods of adjudication."  In re Prudential, 148 F.3d at 316 (internal quotations and citations omitted).  First, the Court does not believe that the class members have a compelling "interest[] in individually controlling the prosecution . . . of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  Plaintiffs' most optimistic predictions concerning the maximum scope of damages at issue in this case valued collective the class damages at $45 million, (Docket Item 101, Pessin Decl. Ex. A at 4), which, when divided among the 28,000 class members, amounts to approximately $1,600 per member.  At an individual level, this is a modest sum better suited to aggregate litigation than individual actions, and, it must be noted, Plaintiffs themselves now concede that they have come nowhere near proving the total class damages they once predicted, making the maximum damages per class member even more modest.  See In re Prudential, 148 F.3d at 316.

"[T]he extent and nature of any litigation concerning the controversy already begun by or against class members," Fed. R. Civ. P. 23(b)(3)(B), likewise suggests that a class action is superior to individual adjudication of this controversy.  The Court's research indicates that, outside the three actions that have been consolidated before this Court, only one lawsuit has been filed by a transcriptionist against MedQuist asserting underpayment of a sort similar to that alleged herein.  See Reddy

24

v. MedQuist, Inc., No. 06-4410, 2009 WL 250050, at *2 (D.N.J.
Jan. 29, 2009) (entering summary judgment in MedQuist's favor).
The fact that only one of the potentially 28,000 affected
transcriptionists sought to file suit over such a claim
demonstrates the superiority of class adjudication, and further
demonstrates that the individual class members lack a compelling
interest in controlling the prosecution of their own claims.

As to "the desirability or undesirability of concentrating
the litigation of the claims" in this forum, Fed. R. Civ. P.
23(b)(3)(C), the Court agrees with Plaintiffs that it is
"appropriate to litigate the case in New Jersey, [MedQuist's]
principal place of business." In re Prudential, 148 F.3d at 316.
And, finally, the Court "need not inquire whether the case, if
tried, would present intractable management problems, see Fed.
Rule Civ. Proc. 23(b)(3)(D), for the proposal [in this motion to
certify a settlement class] is that there be no trial." Amchem,
521 U.S. at 621. The Court therefore concludes that all of Rule
23(b)(3)'s superiority considerations which are applicable to
this class weigh in favor of certification.

### 3.   Summary of Class Certification

The Court, finding that all of the criteria of Rule 23(a)
and Rule 23(b)(3) are satisfied in this matter, will grant
Plaintiffs' unopposed motion for class certification. The class
certified herein shall be defined as:

> **All MedQuist transcriptionists who were compensated on a per line basis for work completed on MedRite, MTS or DEP between November 29, 1998 and August 11, 2008. Excluded from the Settlement Class are Defendants and their Related Parties. Also excluded from the Settlement Class are those Persons who timely and validly requested exclusion from the Settlement Class pursuant to the Notice of Pendency and Proposed Settlement of Class Action.**

Having certified the class in this matter, the Court turns its attention to the terms of the proposed settlement to determine whether it should be approved pursuant to Rule 23(e), Fed. R. Civ. P.

## B.    Fairness of Settlement Terms

Under Rule 23(e)(2), Fed. R. Civ. P., "[i]f the propos[ed settlement] would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." In <u>Girsh v. Jepson</u>, the Court of Appeals set forth the list of factors that a district court must consider when determining whether a proposed settlement is fair, reasonable, and adequate under Rule 23(e)(2). The <u>Girsh</u> factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through the trial; (7) the ability of defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all

the attendant risks of litigation.

In re AT & T Corp., 455 F.3d 160, 164-65 (3d Cir. 2006) (citing Girsh, 521 F.2d at 157).  This Court further recognizes the admonition of the Court of Appeals that courts must be "even more scrupulous than usual in approving settlements where no class has yet been formally certified."  In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 805 (3d Cir. 1995).

The Court reviews the Girsh factors in turn below.  As the following discussion makes clear, the Court finds that the proposed settlement is a fair, reasonable, and adequate outcome that represents a good value for a weak case.  The combination of the injunctive relief targeting the very practices that led Plaintiffs to pursue this lawsuit, with the distribution of settlement funds to AHDI to fund initiatives that benefit medical transcriptionists in general and class members in particular (through the provision of free AHDI courses and materials), is a good value for the Plaintiffs that passes muster under Rule 23(e).

              1.   Complexity, Expense and Likely Duration of the Litigation

The first Girsh factor requires the Court to evaluate "the complexity, expense and likely duration of the litigation."  In re AT & T Corp., 455 F.3d at 164 (citation omitted).

This factor is intended to capture the probable costs, in

27

> both time and money, of continued litigation. By
> measuring the costs of continuing on the adversarial
> path, a court can gauge the benefit of settling the claim
> amicably.

General Motors, 55 F.3d at 812 (internal quotations and citations

omitted).

The Court finds that this factor weighs in favor of

approving the settlement at issue in this case. While these

proceedings are well advanced, with the parties having completed

extensive discovery and motion practice, sustained litigation of

this matter would entail substantial additional costs. Although

the majority of the depositions in this matter have been taken,

the parties represent that additional depositions of experts on

the issues of liability and damages remain to be taken. See id.

(noting that first Girsh factor favored settlement approval where

"[e]ach side would also have needed to hire or produce a retinue

of experts to testify on a variety of complex issues"). Summary

judgment motion practice on the factually and legally complex

issues in this action would consume no insubstantial amount of

the parties' resources. See id. (likelihood of "a plethora of

pretrial motions" weighed in favor of settlement approval).

Should the action survive summary judgment, the subsequent

"complicated, lengthy trial" and the "inevitable . . . post-trial

motions and appeals," In re Warfarin Sodium Antitrust Litig., 391

F.3d 516, 536 (3d Cir. 2004), further indicate that "the probable

costs, in both time and money, of continued litigation," would be

considerable.  General Motors, 55 F.3d at 812.  The first Girsh factor thus weighs in favor of settlement approval.

>    2.   Class Reaction

The second Girsh factor requires the Court to examine "the reaction of the class to the settlement."  In re AT & T Corp., 455 F.3d at 164 (citation omitted).  "In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors."  General Motors, 55 F.3d at 812.  "Courts have generally assumed that 'silence constitutes tacit consent to the agreement.'"  Id. (quoting Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)); see also Lachance v. Harrington, 965 F. Supp. 630, 645 (E.D. Pa. 1997) ("Generally, if the class members do not oppose the class settlement, the court is justified in concluding that they consider it fair and reasonable").

Of the 28,000 class members who received notice, 1.7% have opted out of, or objected to, the proposed settlement.[9]  Under the law of this Circuit, the Court is justified in assuming that more than 98% of the class members "tacit[ly] consent to the agreement."  In re AT & T Corp., 455 F.3d at 164 (citation

---

[9]  The Court recognizes that even this small figure may overstate the percentage of class members who disapprove of the settlement.  At the hearing, counsel for MedQuist drew the Court's attention to the letter of one class member who opted out of the settlement because she felt that she had been fairly compensated by MedQuist and did not desire to participate in the lawsuit.

omitted).  Significantly higher percentages of class members have
objected in cases in which courts have nonetheless found that the
percentage of objecting class members constituted a favorable
class reaction.  See, e.g., Stoetzner v. U.S. Steel Corp., 897
F.2d 115, 118 (3d Cir. 1990) (favorable class reaction where more
than ten percent of class members objected to the proposed
settlement).  The small percentage of class members who have
reacted unfavorably to the proposed settlement indicates that
this factor weighs heavily in favor of approval.

The Court recognizes that "a low level of vociferous
objection is not necessarily synonymous with jubilant support,"
In re Corrugated Container Antitrust Litigation, 643 F.2d 195,
217-18 (5th Cir. 1981), and has scrutinized the objections to the
settlement and accounted for the objectors' views in determining
whether the second Girsh prong weighs in favor of approval.  As
the Court explained above, the vast majority of the objectors
believe that they should be individually compensated for any
underpayment that occurred.  While this position is by no means
an unreasonable one, it runs headlong into the lack of success
Plaintiffs have had in adducing any evidence suggestive of
systematic underpayment.  That is, the objectors seek individual
compensation for underpayment which Plaintiffs, after years of
discovery and concerted efforts, have been unable to prove.
Moreover, the Court notes that over the course of the parties'

extensive arm's-length negotiations, Plaintiffs were unable to
prevail upon MedQuist to consent to a settlement that provided
for direct payments to class members, and that no settlement
could have been reached if Plaintiffs insisted upon such terms.
(Docket Item 119 at 2.)  These two factors diminish the force of
the vast majority of the objectors' response to the settlement.[10]

Taking account of the small number of objectors, and the
contents of the objections to the proposed settlement, the Court
finds that the second <u>Girsh</u> factor weighs in favor of settlement
approval.

> 3.   <u>The Stage of the Proceedings and the Amount of
>       Discovery Completed</u>

As the Court of Appeals has explained:

> The stage-of-proceedings facet of the <u>Girsh</u> test captures
> the degree of case development that class counsel have
> accomplished prior to settlement.  Through this lens,
> courts can determine whether counsel had an adequate
> appreciation of the merits of the case before
> negotiating.

<u>General Motors</u>, 55 F.3d at 813.  This factor weighs heavily in

---

[10]   Moreover, the Court is satisfied, based upon the
testimony of Dr. Preziosi, that AHDI does not advocate in favor
of foreign outsourcing of transcription work, and is not so
closely tied to MedQuist that it cannot represent
transcriptionists' interests.  Dr. Preziosi's testimony was
directly to the contrary.  The Court acknowledges the objections
that raise these concerns, but finds, in light of Dr. Preziosi's
testimony, that the concerns are misplaced.  Although some class
members objected to AHDI's role in providing benefits to the
class under this settlement, it appears that AHDI is best
situated to advocate for class members generally and to provide
courses and materials to class members specifically who choose to
avail themselves of this benefit.

favor of class certification.  This three-year-old litigation manifestly is not in the "inchoate stage of case development," as have been cases in which courts have found the stage-of-proceedings prong to weigh against settlement approval.  Id. at 814.  The parties to this action have engaged in extensive discovery, including having taken the deposition of approximately two dozen witnesses, and Plaintiffs have reviewed over one million documents produced by Defendants.  The parties have, moreover, engaged in substantial motion practice before this Court and before Magistrate Judge Donio.  After three years of litigation, including more than a year of extensive discovery, there can be no doubt that Plaintiffs' "counsel had an adequate appreciation of the merits of the case before negotiating."  Id. at 813.

The Court recognizes that the settlement negotiations in this matter commenced before the class was formally certified, which warrants heightened scrutiny to Girsh's third factor in order to ensure that the settlement is not the product of collusion between Plaintiffs' attorneys and Defendants.  See General Motors, 55 F.3d at 805.  The Court is satisfied that the instant settlement is not the product of collusion.  First, unlike General Motors, in which the de facto class counsel embarked on settlement talks with the defendants within months of having filed the complaint, the Court reiterates that in this

32

case there is nothing but the strongest "indication[] of sustained advocacy by the de facto class counsel." Id. at 806. Indeed, the length of Plaintiffs' counsel's work on this matter and the scope of discovery in this case are both greater than was true in some of the cases the General Motors court cited as examples of "[s]ettlements that have survived this heightened [pre-certification] standard." Id. at 805-06 (citing, e.g., In re Beef Industry Antitrust Litigation, 607 F.2d 167 (5th Cir. 1979), in which "settlement discussions began after six months of discovery").

Second, the Court finds very telling the fact that Plaintiffs' counsel have not sought payment of attorney's fees in this action. Whereas in General Motors, class counsel received millions of dollars in attorneys' fees under the terms of the settlement, prompting the Court of Appeals to note "the potential for attorney-class conflicts," id. at 803, Plaintiffs' attorneys in this matter seek only the reimbursement of their out-of-pocket costs. With Plaintiffs' counsel having not sought any fee award, the "danger . . . that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees," id. at 820 (citation omitted) is simply nonexistent here. The absence of any request for a fee award buttresses the representations that Plaintiffs' attorneys have made to this Court – namely, that this settlement represents

the best deal they could negotiate in view of the possibly insurmountable evidentiary shortcomings they encountered.

The Court accordingly finds that "the stage of the proceedings and the amount of discovery completed" weigh firmly in favor of settlement approval.  In re AT & T Corp., 455 F.3d at 164 (citation omitted).

    4 & 5.  The Risks of Establishing Liability and Damages

The fourth and fifth Girsh factors require the Court to consider the risks Plaintiffs face in establishing liability and damages.  See In re AT & T Corp., 455 F.3d at 164.  The Court's inquiry under these factors "attempts to measure the expected value of litigating the action rather than settling it at the current time."  General Motors, 55 F.3d at 816.  "In examining [these factors], the Court need not delve into the intricacies of the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'"  Perry v. FleetBoston Financial Corp., 229 F.R.D. 105, 115 (E.D. Pa. 2005) (quoting Lachance v. Harrington, 965 F. Supp. 630, 638 (E.D. Pa. 1997).

Plaintiffs represent that after conducting extensive discovery and reviewing the evidence they have been able to gather, their prospects for establishing liability and damages

34

against MedQuist are extremely limited.  In order to prevail on
their claims, which are essentially breach-of-contract claims,
Plaintiffs would need to "prove that a valid contract existed,
Defendant materially breached the contract and Plaintiff[s]
suffered damages as a result of the breach." Fletcher-Harlee
Corp. v. Pote Concrete Contractors, Inc., 421 F. Supp. 2d 831,
833 (D.N.J. 2006) (citing Coyle v. Englander's, 199 N.J. Super.
212, 223 (App. Div. 1985)).  Plaintiffs face serious hurdles in
proving that a uniform contract existed between the
transcriptionists and MedQuist, with a sixty-five character line
calculated in the specific manner Plaintiffs assert.

       More critically, Plaintiffs assert that they would
experience serious, and perhaps insurmountable, difficulties, in
proving that MedQuist "materially breached the contract and
Plaintiff[s] suffered damages as a result." Id.  As Plaintiffs
represent, "[a]fter analyzing thousands of transcription reports
produced by MedQuist during the course of the litigation, and
employing several different approaches to analysis, Plaintiffs
were unable to compile persuasive evidence of systematic
undercounting."  (Pls.' Br. at 7-8.)

       Put more directly, after years of litigation and extensive
discovery, Plaintiffs have adduced no evidence that MedQuist
breached its agreements with the class members by systematically
underpaying transcriptionists.  Plaintiffs did not reach this

conclusion lightly, but only after pouring over thousands of pages of transcription records and enlisting the services of a computer expert to analyze thousands of MedQuist reports, only to find no evidence from which a jury could reasonably conclude that MedQuist had systematically undercounted lines when compensating its transcriptionists.  Surely this realization comes as a disappointment to many class members, but these shortcomings are not likely to be cured by further pursuit in this class-based litigation.  In the face of such evidentiary shortcomings, Plaintiffs face very serious limitations on their capacity to establish liability or damages.[11]  See In re AT & T Corp., 455 F.3d at 164.  Girsh's fourth and fifth factors weigh firmly in favor of settlement approval.

> 6.   Risks of Maintaining a Class Action Through the Trial

The sixth Girsh factor tests "the risks of maintaining a class action through the trial."  In re AT & T Corp., 455 F.3d at 164-65.

---

[11]   The Court notes that the only individual case of which it is aware in which an individual transcriptionist sued MedQuist on an underpayment theory to that presented by Plaintiffs herein suffered from precisely the same problem.  In Reddy v. MedQuist, Inc., the court, in granting MedQuist's motion for summary judgment, explained that the plaintiff "offered no evidence to support the breach of contract claim in her Complaint, that her line counts were manipulated so that she was paid less than if her line counts were calculated according to the standard procedure."  No. 06-4410, 2009 WL 250050, at *2 (D.N.J. Jan. 29, 2009).

> The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits. Thus, the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action.

General Motors, 55 F.3d at 817.

The Court finds that the sixth Girsh factor tips in favor of settlement approval. This is because the choice-of-law concerns raised by a nationwide class of transcriptionist-plaintiffs, and the individual affirmative defenses MedQuist asserts that it would raise in the event this action were to proceed creates a strong "risk that such a nationwide class . . . 'would create intractable management problems if it were to become a litigation class, and therefore be decertified.'" First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 520 (E.D. Pa. 2007) (quoting Warfarin, 391 F.3d at 537). While the Court was not required to account for such management problems in determining whether to certify a class for settlement only, see Amchem, 521 U.S. at 621, such factors would indeed be accounted for if this action were to proceed to trial, and the risk of decertification of this large, nationwide class is not insubstantial. The Court thus finds that the sixth Girsh factor weighs in favor of approving the proposed settlement.

       7.   <u>The Ability of Defendants to Withstand a Greater Judgment</u>

The seventh <u>Girsh</u> factor, "the ability of defendants to withstand a greater judgment," <u>In re AT & T Corp.</u>, 455 F.3d at 165 (citation omitted), is a neutral factor for settlement approval.  The Court takes "judicial notice of [MedQuist's] Annual Report on Form 10-K," for the 2008 fiscal year, <u>Concentra</u>, 534 F. Supp. 2d at 520, pursuant to Federal Rule of Evidence 201(b)(2), which reveals that MedQuist has assets in excess of $200 million and net revenues in excess of $325 million.  There can be little doubt that MedQuist is capable of withstanding a judgment greater than the $1.5 million provided by the proposed settlement.

      8 & 9.   <u>Range of Reasonableness in Light of the Best Possible Recovery and the Risks of Litigation</u>

<u>Girsh</u>'s eighth and ninth factors require the Court to review whether the proposed settlement falls within a range of reasonableness in light of the best possible recovery and the attendant risks posed by the litigation.  <u>In re AT & T Corp.</u>, 455 F.3d at 165.  The essence of the Court's analysis under these prongs is to assess "whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case." <u>General Motors</u>, 55 F.3d at 806.  In light of Plaintiffs' representations concerning the evidentiary holes in their case, there can be little doubt that Plaintiffs

face substantial (and likely insurmountable) litigation risks –
this is not, in other words, "an otherwise strong case." Id.
The question then becomes whether the relief Plaintiffs have
secured through the proposed settlement constitutes a good value
for a case which has extremely limited prospects for success if
it were to proceed.

The Court finds that the proposed settlement is a good value
for Plaintiffs' case.  The proposed settlement represents a fair
and innovative approach to the settlement of a weak case, which,
although it does not provide for direct payment to the individual
class members, confers real and significant benefits on the
members individually and on the class as a whole.  At the outset,
the Court recognizes that "[t]he absence of money damages does
not necessarily mean the settlement is unreasonable or unfair,"
Concentra, Inc., 534 F. Supp. 2d at 520, and that courts have
approved class settlements which provided for injunctive relief
only, see id., or for injunctive relief in addition to the
distribution of a settlement fund to an organization for the
class's benefit, see, e.g., Perry, 229 F.R.D. at 117-18; In re
Mexico Money Transfer Litigation, 267 F.3d 743, 748 (7th Cir.
2001), as satisfying Rule 23(e)'s considerations of fairness.
The question is whether the proposed settlement provides a good
value for Plaintiffs' weak claims, notwithstanding the absence of
direct monetary payments to individual class members.  See

39

Concentra, Inc., 534 F. Supp. 2d at 520.

The proposed settlement "provides real benefits to the class despite the absence of any [individual] monetary payment." Id. at 522. First, the Court finds that the injunctive relief Plaintiffs have secured, under which MedQuist will be required to take seven concrete steps in order to improve the transparency of its compensation policies, (Docket Item 133 Ex. A-1 at 3-4), confers a significant benefit on the entire class by clarifying the very line counting and compensation practices that led to this dispute. This clarification applies to present transcriptionists and applicants alike, so that such misunderstandings are unlikely to arise in the future. Indeed, in view of MedQuist's status as the country's largest provider of medical transcription services, the improvements in MedQuist's compensation policies required by the proposed settlement may well set the standard in the industry for transparency in compensation policies. In any event, the improvements to MedQuist's compensation policies secured by the injunction will benefit the class in a manner that "would not have been undertaken but for this lawsuit and its settlement."[12]

---

[12] In light of Plaintiffs' failure to develop any evidence suggestive of systematic underpayment by MedQuist, the injunctive relief provides a resolution for what the evidence now suggests was the actual harm underlying this conflict – the misunderstanding between the parties over the definition of a payroll line.

Concentra, Inc., 534 F. Supp. 2d at 521.

In addition to the substantial benefit conferred by an injunction aimed at the very practices that gave rise to this dispute, the settlement provides direct benefits to the individual class members by permitting them to take advantage of AHDI's professional educational programming free of charge.  The Court has carefully reviewed the list of course offerings from which class members will be permitted to choose under the settlement terms.  AHDI's courses range from helping to prepare transcriptionists for certification examinations, to a host of continuing education topics, to professional development programs aimed at improving skills like writing and public speaking. Given the range of topics covered through the educational programming secured by the settlement, class members with various professional interests and at different stages of their careers in medical transcription will be able to benefit from the free courses in an individualized manner that targets each class member's professional interests.  "[T]he Court recognizes that examining the market value of these [non-monetary] items is one method of placing a value on the settlement in light of the best possible recovery."  Perry, 229 F.R.D. at 117.  All told, the collective market value for the AHDI offerings provided by the settlement, (Docket Item 117 Ex. C, Attachment A), is $2,048,500. This is a substantial benefit to the individual class members,

particularly in view of "all the attendant risks of litigation" in a case with the evidentiary shortcomings discussed in detail above.  In re AT & T Corp., 455 F.3d at 165 (citation omitted).

Finally, the settlement provides for a payment of not less than $1 million to AHDI to further the organization's work in "giv[ing] thousands of medical transcriptionists a voice before legislative and regulatory agencies and to ensure MTs are recognized for their contributions to patient safety and risk management."  AHDI, http://www.ahdionline.org/scriptcontent/about.cfm (last visited March 30, 2009).  The class members, in addition to members of their profession in general, will benefit from AHDI's advocacy on their behalf.  Under the circumstances of this case – with the unfavorable prospects for success if the matter were litigated and the relatively modest size of the settlement fund – the Court echoes the conclusions of courts evaluating similar settlement provisions that the "distribution [to AHDI], as part of the overall settlement, is a creative and useful means of achieving a fair and reasonable resolution." Perry, 229 F.R.D. at 118; Mexico Money Transfer Litigation, 267 F.3d at 748.

Viewing the terms of the settlement as a whole – the injunctive relief, the provision of free AHDI courses, and the distribution of funds to AHDI for further advocacy on behalf of medical transcriptionists – the Court finds that the settlement

confers real and significant benefits on the class members as individuals and the class in general.  In light of "all the attendant risks of litigation," In re AT & T Corp., 455 F.3d at 165 (citation omitted), the Court concludes that "the decision to settle represents a good value for a relatively weak case." General Motors, 55 F.3d at 806.

            10.   Summary of Girsh Findings

        Collectively, the weight of the Girsh factors militates in favor of approving of this settlement.  As the Court's discussion above makes clear, eight of the nine factors weigh in favor of approval, and only the seventh factor – MedQuist's capacity to withstand a greater judgment – is a neutral factor.  Particularly in view of the benefits that the settlement confers upon the class members and the dim prospects for success on the merits if this action were to proceed, however, the Court does not find that the unsurprising fact that a corporate defendant might be able to withstand a greater judgment undermines the appropriateness of a settlement that represents a good value for a weak case.  Upon its careful review of the record and the matters raised at the Final Settlement Hearing, the Court finds that the proposed settlement is the "fair, reasonable, and adequate" product of diligent efforts by class counsel to secure a reasonable resolution of this dispute for the class members' benefit, and will grant Plaintiffs' unopposed motion for approval

of the proposed settlement pursuant to Rule 23(e), Fed. R. Civ.

P.

**C.   Motion for Reimbursement of Costs**

As the Court explained, <u>supra</u>, Plaintiffs' counsel have not

sought attorneys' fees for the thousands of hours they have

invested in litigating this matter for more than three years.

They have, however, sought to be reimbursed to the out-of-pocket

expenses they have incurred over the course of litigating this

case.  Plaintiffs seek $247,998.59 in reimbursement of their

attorneys' costs.

The Court has carefully reviewed Plaintiffs' submissions in

support of their motion seeking the reimbursement of expenses,

finds that these expenditures are reasonable and well-documented,

and will grant Plaintiffs' motion.  <u>See</u>, <u>e.g.</u>, <u>Yong Soon Oh v. AT</u>

<u>& T Corp</u>, 225 F.R.D. 142, 154 (D.N.J. 2004).  The Court finds

that the attorneys' sworn submissions in support of this motion,

(Pessin Decl. Exs. A-G), include only actual out-of-pocket

expenses, and that these expenditures are reasonable in view of

the extensive efforts Plaintiffs' attorneys have undertaken in

litigating this matter.  Plaintiffs took and defended dozens of

depositions, reviewed thousands of pages of documents, and

conducted hundreds of interviews (in person and through a

retained investigative firm) over the more than three years of

litigation in this case.  Finding that these out-of-pocket

44

expenses were reasonably incurred and well-documented, the Court will grant Plaintiffs' motion for reimbursement of their proven out-of-pocket expenses.

**IV.  CONCLUSION**

For the reasons discussed above, the Court will grant Plaintiffs' motion for class certification, settlement approval, and reimbursement of expenses.  The accompanying Orders are entered.

**March 31, 2009**                          **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            United States District Judge